1998 N.D.App. 9

**Renae L. MONSON, Plaintiff and Appellee,**

v.

**Ronald L. MONSON, Defendant and Appellant.**

**Civil No. 980006CA.**

Court of Appeals of North Dakota.

Sept. 15, 1998.

Patti Jo Jensen, of Lindquist, Jeffrey & Jensen, East Grand Forks, MN, for plaintiff and appellee.

Thomas V. Omdahl, Grand Forks, for defendant and appellant.

PER CURIAM.

[¶ 1] Ronald L. Monson has appealed "from the Judgment entered by the trial court on the 20th day of November, 1997,"[1] in a divorce action filed by Renae L. Monson. We affirm.

[¶ 2] The parties were married in 1977. Renae sued for divorce in 1995. Hearings were held on January 21, August 6, and October 10, 1997. The judgment granted Renae a divorce and custody of the parties' two minor children, ordered Ronald to pay child support of $600 per month, and divided the parties' marital property. Ronald appealed, raising the following issues:[2]

I. To determine whether the Defendant was given notice of trial as required by North Dakota Rules of Civil Procedure.

II. To determine whether the Defendant was given an opportunity to make his defense.

III. To determine whether the court was clearly erroneous in determining child support.

## I

[¶ 3] Ronald Monson did not participate in the hearing on August 6, 1997. Ronald contends he was not served with notice of the trial scheduled for August 6, 1997, in accordance with N.D.R.Civ.P. 5, which requires service of papers upon a party or upon an attorney representing a party, because his attorney had withdrawn and he was not represented by counsel when the notice of hearing was issued.

[¶ 4] In requesting a new trial and a new judge at the hearing afforded him on October 10, 1997, Ronald's attorney stated: "But Mr. Monson's position is that he never received the notice." He did not then rely, as he does now, on N.D.R.Civ.P. 5. Thus, Ronald did not

1. The trial court issued findings of fact, supplemental findings of fact, conclusions of law, and order for judgment on November 20, 1997. We will treat the appeal as one from the judgment, which was entered on November 26, 1997. *See, e.g., Zueger v. Carlson*, 542 N.W.2d 92, 94 n. 2 (N.D.1996).

2. Although he asserted in his brief that the property distribution was "inequitable" and "grossly unfair," Ronald did not raise the property distribution in the statement of issues in his brief. The property distribution is heavily weighted in favor of Renae. A property division need not be equal to be equitable, but a substantial disparity should be explained. *Young v. Young*, 1998 ND 83, ¶ 11, 578 N.W.2d 111. As *Bell v. Bell*, 540 N.W.2d 602 (N.D.1995), shows, in some cases, even an award of all marital assets to one party may not be clearly erroneous. A number of the trial court's findings explain the disparity in favor of Renae: Ronald's "mismanagement of Big H and diverting funds from that corporate entity;" "Ron's choice to abandon his family and dismantle their businesses;" Ronald "has been less than candid with the Court regarding the extent of his assets;" Ronald "deliberately and with the intent of defrauding [Renae] secreted and dissipated assets of [Big H] corporation to [Renae's] detriment;" Ronald's conduct "caused the extreme debt load of Big H and the parties;" and "The Court finds that this divorce is the fault of [Ronald] on the grounds of abuse, neglect, financial irresponsibility, dissipation of assets and adultery." Because Ronald did not include the property division in his statement of the issues in his brief, and the trial court's findings adequately explain the disparate division, we need not further address the property division.

give the trial court an opportunity to rule on the issue of compliance with N.D.R.Civ.P. 5, and he may not now raise this new issue for the first time on appeal. *See, e.g., Medd v. Fonder,* 543 N.W.2d 483, 487 (N.D.1996); *Wingerter v. North Dakota Dep't of Transp.,* 530 N.W.2d 362, 365 (N.D.1995). We will, however, review the trial court's determination that Ronald did, in fact, receive notice and knowledge of the trial scheduled for August 6, 1997.

[¶ 5] Knowledge is generally a question of fact. *Burr v. Kulas,* 1997 ND 98, ¶ 11, 564 N.W.2d 631; *Zettel v. Licht,* 518 N.W.2d 214, 215 (N.D.1994). Under N.D.R.Civ.P. 52(a), we will not reverse a trial court's finding of fact on appeal unless it is clearly erroneous. *Peterson v. Ramsey County,* 1997 ND 92, ¶ 7, 563 N.W.2d 103. A finding of fact is clearly erroneous if induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire evidence the reviewing court is left with a definite and firm conviction a mistake has been made. *Gierke v. Gierke,* 1998 ND 100, ¶ 15, 578 N.W.2d 522.

[¶ 6] The first day of trial in this case was on January 21, 1997. The trial was continued. By letter of May 7, 1997, Ronald's attorney, Shirley A. Dvorak, requested the matter "be re-scheduled to a later date," because of flood damage in her Grand Forks office. On June 26, 1997, the trial court issued a notice to appear stating that a hearing was scheduled for August 6–8, 1997. By letter of June 29, 1997, sent to Ronald at his Leonard, Minnesota, address,[3] Attorney Dvorak informed Ronald that the court had signed an order permitting her to withdraw as counsel and advising Ronald to tell her "who your new counsel is so that you do not have a lapse in representation." By letter of July 1, 1997, sent to Ronald at his Leonard, Minnesota, address, Attorney Dvorak wrote Ronald: "Also enclosed please find a Notice to Appear which schedules the new trial date. Please make sure that you forward this Notice to your new attorney."

■ [¶ 7] Section 31–11–03(24), N.D.C.C., provides a disputable presumption "[t]hat a letter duly directed and mailed was received in the regular course of the mail." A letter duly directed and mailed is presumed received in the regular course of business. *Myra Found. v. Harvey,* 100 N.W.2d 435, 438 (N.D.1959). Although she had recently withdrawn as Ronald's counsel, Attorney Dvorak, nevertheless, sent a letter and notice of the trial date to Ronald at his Minnesota address. The letter is presumed to have been received in the regular course of the mail. As in *First Bank v. Neset,* 1997 ND 4, ¶ 18, 559 N.W.2d 211, Ronald "has wholly failed to rebut that presumption."

[¶ 8] At the hearing on October 10, 1997, the trial court addressed Ronald's knowledge of the August 6, 1997 hearing:

> We had contact from Mr. Thompson, who was an attorney that Mr. Monson was going to hire. Mr. Thompson asked us to postpone the pretrial conference because they were just working on him hiring Mr. Thompson. Within that context, Mr. Monson would have had to know that a trial was proceeding. I mean, he was the one that contacted Mr. Thompson.
>
> . . . .
>
> I am satisfied that he had sufficient service. . . . [H]e had sufficient notice that this trial was taking place.
>
> And it is quite remarkable that he calls—the very day that the trial is coming, he calls up the Court and says, "I knew nothing about this."
>
> . . . .
>
> I just don't believe the fact that he did not know that the trial was going to take place. That's the bottom line.

The trial court made the following supplemental findings of fact:

> On August [6], 1997, there was a bench trial held before the Honorable Donovan Foughty, District Court Judge, in the Law Enforcement Center Courtroom, Grafton, North Dakota. On this date the Defen-

---

**3.** At the hearing on October 10, 1997, Ronald testified he had lived at Leonard, Minnesota, since June 2, 1996.

dant called and spoke with me claiming that he had no notice of the trial. Plaintiff's Exhibit # 14 shows that he did in fact have notice from his counsel, Shirley Dvorak.

Further to establish that fact, Neil Thompson, Attorney at Law contacted Plaintiff's Attorney and this Court on July 16, 1997 requesting that a pretrial conference be postponed for July 17, 1997, because he and Mr. Monson were in negotiations for the purpose of Mr. Thompson being hired as counsel. This supports the proposition that notice was given. Mr. Monson never did hire Mr. Thompson. Thompson did convey to the Court that although he could not recall the date of trial, he was aware a trial date was set.

In his appellate brief, Ronald's present attorney acknowledges Ronald consulted Neil Thompson about representing him, says Ronald did not retain Thompson, and notes that "the trial court did not indicate whether Neil Thompson had informed Ronald Monson of the trial date." However, one reasonable inference the trial court could draw from the contact with Thompson is that Thompson learned of the trial date from Ronald.

[¶ 9] There is evidence supporting the trial court's findings about Ronald's notice and knowledge of the trial scheduled for August 6, 1997. We conclude that the findings are not clearly erroneous. Furthermore, any deficiency in notice there may have been was cured when the trial court granted Ronald's request for an additional hearing in October 1997 after Ronald had declined to participate in the August 1997 hearing.

## II

[¶ 10] Ronald contends he was not afforded an adequate opportunity to present his case, arguing:

Ronald Monson was not given a full and fair opportunity to present his case. He was not allowed to cross-exam his wife, Renae Monson, nor cross exam her witnesses. He was not afforded enough time to present his case and his witnesses. The trial court limited the direct testimony of Ronald Monson. Transcript at 11. The trial was "a very one-sided affair." Transcript at 14 line 8. The trial court was biased against Mr. Monson.

We are not persuaded the record supports Ronald's conclusory assertions.

[¶ 11] Ronald has not drawn our attention to any evidence from the October 10, 1997, proceeding demonstrating that he was not allowed to cross-examine his wife or any of the witnesses she had called in the earlier proceedings. Other than Ronald, his attorney did not subpoena or call any witnesses, including Renae Monson. When the court asked if he would be calling any witnesses, Ronald's attorney said, "No, Your Honor." Near the end of the hearing, the trial court said, "If nothing else, we're off the record." Ronald's attorney replied, "Okay." The following colloquy occurred between court and counsel at the end of the hearing:

THE COURT: . . .

Anything else?

MS. JENSEN: I don't think so, Your Honor. Thank you.

THE COURT: Okay. We're off the record.

MR. OMDAHL: Okay. Thank you, Your Honor.

[¶ 12] Ronald presented no offer of proof of additional evidence he wished to introduce to create a record permitting informed appellate review. *See, e.g., Wilhelm v. Wilhelm,* 543 N.W.2d 488, 490 (N.D.1996); N.D.R.Ev. 103(a)(2). The Explanatory Note following N.D.R.Ev. 103(a)(2) "clearly directs the parties to create a record which will permit informed appellate review." *Gorsuch v. Gorsuch,* 392 N.W.2d 392, 394 (N.D.1986). One of the touchstones for an effective appeal on any proper issue is that the matter was appropriately raised in the trial court so the trial court could intelligently rule on it. *Beavers v. Walters,* 537 N.W.2d 647, 652 (N.D. 1995). A party's failure to object waives any evidentiary challenges. *Reinecke v. Griffeth,* 533 N.W.2d 695, 702 (N.D.1995). "Thus, in the absence of an objection below, we will not consider the issue on appeal." *Sabot v. Fargo Women's Health Org.,* 500 N.W.2d 889, 894 (N.D.1993).

[¶ 13] The October 10, 1997, hearing lasted all day. Ronald did not object to the amount

of time given to present his case, did not assert he needed more time, agreed to abide by the court's time limit, did not tell the court he wanted to call more witnesses or cross-examine any witnesses who had previously testified, and offered nothing further when, at the end of the hearing, the court asked, "Anything else?" Under these circumstances, Ronald cannot now complain that his right to present his case was restricted by the trial court.

[¶ 14] The "one-sided affair" to which Ronald's attorney referred was the August 6, 1997, hearing in which Ronald chose not to participate. The October 10, 1997, hearing was an opportunity the trial court gave Ronald to remedy or mitigate the consequences of failing to participate in the earlier hearing. There is no evidence supporting Ronald's assertion that the trial court was biased against him.

[¶ 15] We conclude that the trial court afforded Ronald Monson an adequate, full, and fair opportunity to present his case.

### III

[¶ 16] The trial court made the following findings of fact on income and child support:

> It is difficult to determine what the Defendant's income will be. Because of his own acts his business reputation has been damaged. The Court will determine that he now has the ability to earn after taxes between $2,000.00 and $3,000.00 a month and the Court will Order child support in the amount of $600.00 per month.[4]

Ronald contends that the child support determination is clearly erroneous.

[¶ 17] To apply the child support guidelines, a trial court must determine the child support obligor's net income. *Foreng v. Foreng*, 509 N.W.2d 38, 40 (N.D.1993). In *Wolf v. Wolf*, 557 N.W.2d 742, 744 (N.D.1996), the court reversed a child support award and remanded for more accurate findings about the child support obligor's income. The trial court used "vague figures ... despite the fact it appears adequate evidence was admitted for the trial court to make a precise finding as to the gross and monthly net incomes, as the guidelines require."

[¶ 18] Ronald had farmed and managed the parties' potato brokerage business, Big H Potato Sales, Inc. The trial court awarded most of the parties' land to Renae and appointed a receiver for Big H, with instructions to report to the court each month. The trial court recognized Ronald's earning ability had decreased:

> Ron's earning ability has decreased because of injuries sustained in a farming accident. His reputation as a potato broker has been significantly damaged because of his own actions; of mismanagement of Big H and diverting funds from that corporate entity. Ron has managed his Minnesota farming operation since his accident with the assistance of only one hired man and his girlfriend.

The evidence was not adequate for the trial court to make a precise finding as to what Ronald's net income would be after the divorce.

[¶ 19] In light of the business acumen Ronald has acquired, his farming and business experience, and his physical abilities, our review of the evidence has not left us with a definite and firm conviction that the trial court made a mistake in finding Ronald would have a net income of $2,000–3,000 per month and in ordering Ronald to pay $600 per month for the support of the parties' two minor children. As Ronald said in a post-trial brief filed in district court: "This case has been long and bitter for both parties." No productive purpose would be served by prolonging this matter by remanding for further proceedings and additional findings about Ronald's income. If experience shows the trial court's finding about Ronald's income is wrong, the parties may have the child support reviewed under N.D.C.C. § 14–09–08.4.

---

4. The child support ordered is consonant with the low end of Ronald's income range found by the trial court. Under the child support guidelines, the presumptive amount of support for two children by an obligor with a monthly income of $2,000 is $582 per month. *See* N.D. Admin. Code § 75–02–04.1–10.

## IV

[¶ 20] Asserting that she "had incurred substantial attorney's fees; both in the underlying proceeding and because of this appeal," Renae has requested "this Court remand the issue of the award of attorney's fees to the trial judge." We deny Renae's conclusory request.

## V

[¶ 21] The judgment is affirmed.

[¶ 22] HOBERG, C.J., WILLIAM F. HODNY, Surrogate Judge and DEBBIE G. KLEVEN, District Judge, concur.

